UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION


| | | |
|---|---|---|
| BARBARA LOGAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 1:04-cv-0797-SEB-JPG |
| vs. | ) | |
| | ) | |
| THE INDIANA DEPARTMENT OF | ) | |
| CORRECTIONS, DEAN REIGER, ROSE | ) | |
| VAISVILAS, JIM LADD, RON RICE, | ) | |
| DOUGGEHRKE, PRISON HEALTH | ) | |
| SERVICES OF INDIANA, LLC and CRAIG | ) | |
| UNDERWOOD, | ) | |
| | ) | |
| Defendants. | ) | |


## ENTRY ON SUMMARY JUDGMENT MOTIONS


Plaintiff, Barbara Logan, is a former employee of Defendant, Prison Health Services of

Indiana, LLC ("PHS").  In January of 2003, she was terminated from her employment as

Healthcare Administrator for PHS at an Indiana Department of Corrections ("IDOC") facility in

New Castle, Indiana, after refusing to accept a transfer to another IDOC facility.  Logan claims

the attempt to force her transfer and her eventual termination were in retaliation for her prior

exercise of her first amendment right to free speech, in violation of 42 U.S.C. § 1983, and that

the Defendants' actions also violated Indiana's black-listing laws, specifically Ind. Code § 22-5-

3-3.  She has named PHS, IDOC and several individual employees of both entities as Defendants

in this lawsuit.  IDOC and its employees, Dr. Dean Reiger, Rose Vaisvilas, Jim Ladd, Ron Rice

and Doug Gehrke ("State Defendants") are also the target of her claim of tortious interference

with an employment relationship.  In two separate motions, all Defendants have moved for

summary judgment in their favor.

## I.      Summary Judgment Standard

On a motion for summary judgment, the burden rests on the moving party to demonstrate

"that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 325 (1986).  After the moving party demonstrates the absence of a

genuine issue for trial, the responsibility shifts to the non-movant to "go beyond the pleadings"

and point to evidence of a genuine factual dispute precluding summary judgment.  *Id.* at 322-23.

"If the non-movant does not come forward with evidence that would reasonably permit the finder

of fact to find in her favor on a material question, then the court must enter summary judgment

against her."  *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994) (citing

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986); *Celotex*, 477

U.S. at 322-24; *Anderson*, 477 U.S. at 249-52).

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for

resolving factual disputes. *Waldridge*, 24 F.3d at 290. Therefore, in considering a motion for

summary judgment, we draw all reasonable inferences in favor of the non-movant.  *Venters v.*

*City of Delphi*, 123 F.3d 956, 962 (7th Cir. 1997).  If genuine doubts remain, and a reasonable

fact-finder could find for the party opposing the motion, summary judgment is inappropriate.

*See Shields Enterprises., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf*

*v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir.1989).  But if it is clear that a plaintiff will be

unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Waldridge*, 24 F.3d at 920.

## II.   Factual Background

As the legal standard requires, we examine the facts in the light most favorable to the Plaintff, Barbara Logan.

In 2002, IDOC opened a new correctional facility in New Castle, Indiana, which  houses prisoners with special medical and mental health needs.   Plaintiff, who had significant prior mental health administration experience, sought and obtained  employment as the Healthcare Administrator ("HCA") at the facility.  Her employment was with PHS, a private  corporation which has a contract with IDOC to provide professional staff, such as licensed physicians, dentists, psychologists and healthcare administrators to IDOC facilities.  Logan's immediate supervisor at PHS was Carey Harris and Defendant Craig Underwood was the Division Vice-President.  Defendants Rice and Gehrke were the Superintendent and Assistant Superintendent, respectively, at the New Castle facility.  They were employed by IDOC, as was Lee Ann Lewis, the Director of Nursing ("DON") at New Castle and Defendant Vaisvilas, the Nursing Director over all IDOC facilities.  Defendant Reiger is the IDOC Medical Director and Defendant Ladd is IDOC's Deputy Commissioner for Programs.  IDOC had authority to approve any PHS appointment to an HCA position and PHS obtained that approval prior to offering Logan the position.

The department's approval of Logan as HCA at New Castle was short-lived.  After the facility opened in April of 2002, things went well for a few months.  However, as the lead health care administrator at the facility,  Logan became increasingly concerned with the inadequate level of nursing care being provided.  The handling and dispensing of medicine, the timely completion of health screens and assessments and the timely completion of doctor's orders were all areas of nursing responsibility that Logan found to be in great disarray.  In short, she believed that the DON, Ms. Lewis, was inexplicably absent from her duties too often and not living up to her responsibilities in directing the nursing program.  After unsuccessfully attempting to prompt change on her own, Logan went to her own supervision as well as the IDOC facility leadership with her concerns in an attempt to instigate improvements.  Initially, her concerns were well received and promises of some type of corrective action were made by the local IDOC authorities.  Eventually, however, Logan, rather than Lewis, became the target of IDOC's response relative to the administration of healthcare at the facility and pressure was applied to PHS by IDOC to remove Logan from the New Castle facility and place her at some other facility.

Logan pegs her own problems to having opined that Lewis needed to be removed from the DON position at New Castle because in Logan's opinion the nursing problems had become extremely critical, to a point of bordering on criminal neglect.  A meeting was held on August 16, 2002 at IDOC headquarters in Indianapolis.  In attendance at the meeting were Logan, Underwood, and Harris from PHS, and IDOC employees Reiger, Ladd, Vaisvilas, Rice, Gehrke, Jim Fistervich (Budget Director) and Chuck Miller (Northern Regional Director).  During that meeting, Logan addressed the group and gave examples to support her belief that poor nursing

care at the facility had reached a critical level, leaving no choice but to remove Lewis and find a new DON for the facility.  According to Logan, her reports of poor nursing care were not well received by any of the IDOC executive staff.  Vaisvilas took issue with Logan's account and directed some angry comments at Logan, similar to remarks she had made in a telephone conversation with Logan prior to the meeting after hearing from others of Logan's dissatisfaction with Lewis.  The other executives from IDOC headquarters seemed to center their attention on Rice and Gehrke who had first line supervisory responsibility for Lewis's performance.  The suggestion by Logan, a PHS employee, that IDOC remove Lewis from the DON position, was not specifically her responsibility as a PHS employed administrator, but she felt strongly that something had to be done to correct what had become a near crisis situation.  She left the meeting with the sense that she had gotten her point across and that the IDOC executives were in general agreement with her that Lewis needed to be replaced.

However, during a break in the meeting, Gehrke informed the regional director that, despite some effort to record performance deficiencies on the part of Lewis, in his opinion there was insufficient documentation to support Lewis's immediate removal from the DON position for poor performance.  Vaisvilas also was not in favor of removing Lewis as DON.   Essentially, Gehrke wanted more time to document performance problems to assure that if no improvement was made she could be replaced without fear of reprisal on her part for a lack of notice.  After the meeting reconvened that day, a number of additional topics were discussed.  PHS representatives eventually departed and the IDOC contingent decided that it would be best to put Lewis on a performance improvement plan, as suggested by Vaisvilas and Gehrke, to assure that she "got the

message" with regard to the concerns raised regarding nursing care at the facility and also had a chance to improve her performance as a DON.

Prior to the August 16th meeting, Logan had never had any concerns voiced to her regarding her own performance as HCA at New Castle.  That changed shortly after the meeting.  Gehrke became hypercritical of Logan's performance and directed her to work several evening and midnight shifts during the week, creating an extremely difficult work schedule for her.  Lewis was informed of Logan's attempt to have her removed and she confronted Logan about the effort, telling Logan that she had been around IDOC a long time and could show her a thing or two about "how the game was played."  Their relationship grew extremely cold.  Lewis retained a key to Logan's office and Logan maintains that things began to disappear from her office.  IDOC employees from outside the New Castle facility were called in to review Logan's work.  Defendant Reiger came to New Castle to meet with Logan and Lewis, indicating to Logan that it was much easier for IDOC to remove an administrator then it was to remove a DON, because all that was necessary was for IDOC to tell PHS that the HCA was no longer acceptable and PHS had no choice but to follow IDOC's direction and find someone else to fill that role.  Gehrke later barred Logan from attending nursing meetings and told nurses to bring all health care issues to Lewis's attention and not discuss them with Logan.  According to Gehrke, the lack of effective communication between Logan and Lewis made it extremely difficult to effectively monitor the progress of the medical care programs.   According to Logan, she continued her efforts to act professionally but was stripped of responsibility and retaliated against by Gehrke, Rice and Vaisvilas.

After additional complaints from Rice were voiced regarding Logan's completion of health care directives, her medical audit meeting minutes and her relationship with the DON, a meeting was held in November of 2002 between IDOC authorities and Underwood from PHS. Some of the specifics with respect to what was said and who made certain remarks are matters in dispute, but IDOC's general position in these discussions with PHS is not in dispute. IDOC's message was that Logan needed to go, and, to their way of thinking, having her trade places with the HCA at the nearby IDOC Pendleton facility made the most sense.

On December 13, 2002, Underwood told Logan that she was being removed as HCA at New Castle and was being given the option of a transfer to Pendleton. Logan maintains that Underwood agreed with her that this action by IDOC was in retaliation for her complaints about the nursing care, but Underwood indicated he had no choice in taking this action because he had a contract he needed to protect. Logan's immediate reaction was to refuse the transfer, citing her need to work close to her home due to her husband's disability, her refusal to be "shut up" about inadequate healthcare and the fact that she was attracted to the HCA position at New Castle because it was a unique special-needs facility, which was not the situation at Pendleton. Underwood gave Logan two weeks of vacation leave during which she could reconsider the offer since she would no longer be allowed to work at the New Castle facility. On January 7, 2003, Logan and Underwood met again and Logan informed him that she had not changed her mind, would not accept the transfer, was certain that this was all done in retaliation and that she would appreciate his support of her efforts to remain at New Castle. Alas, Underwood did not back her, and, in anticipation of her unwillingness to drop the fight, asked her not to name PHS in any subsequent lawsuit. He then terminated her employment. Interestingly, two months later, Rice

removed Lewis from the DON position at New Castle but, after filing a grievance and securing

the backing of Vaisvilas, Lewis was transferred to a quality assurance position at IDOC

headquarters in Indianapolis.

## III.   **Discussion**

### A.   *Whistleblower Claim  -  IND. CODE § 23-5-3-3*

In bringing this action, Plaintiff cites IND. CODE § 23-5-3-3 as Indiana's whistleblower

protection statute. Though it is codified under the state's black-listing laws, it does provide some

protection to those who bring the unethical or illegal practices of their employers to the attention

of authorities.  However, its protection is quite limited, and whether it actually provides a private

cause of action has yet to be determined by Indiana courts.  In pertinent part, the statute

provides:

> (a)  An employee of a private employer that is under public contract may report in
> writing the existence of :
>> (1) A violation of a federal law or regulation;
>> (2) A violation of state law or rule;
>> (3) A violation of an ordinance of a political subdivision (as
>> defined in IC 36-1-2-13); or
>> (4) The misuse of public resources;
> concerning the execution of a public contract first to the private employer, unless
> the private employer is the person whom the employee believes is committing the
> violation or misuse of public resources.  ...  If a good faith effort is not made to
> correct the problem within a reasonable time, the employee may submit a written
> report of the incident to any person, agency, or organization.

> (b) For having made a report under subsection (a), an employee may not:
>> (1) Be dismissed from employment;
>> (2) Have salary increases or employment related benefits withheld;
>> (3) Be transferred or reassigned;

> (4) Be denied a promotion that the employee otherwise would have received; or
> (5) Be demoted.

IND. CODE § 22-5-3-3.

Logan clearly qualifies as an employee of a private employer which is party to a public contract.[1]  That said, we need more than a shoehorn to make the facts of this case fit the context of this statute.  Logan asserts that she reported, in writing, conduct that amounted to several violations of state laws and rules, pointing to an undated incident report she authored which she says was sent to IDOC on August 13, 2002[2], a September 22, 2002 memo to PHS Vice-President Underwood[3], and an October 2002 memo to internal affairs investigators at IDOC, which the

---

[1]In attempting to hold the State Defendants liable under the statute, Logan contends in her reply brief that the doctrine of dual employment should apply here, making both IDOC and PHS her employer.  Indiana has recognized, for purposes of workers' compensation, that if two employers associate themselves together so that both are in direct control of the employee and the employee is accountable to both, they can both be considered that employee's employer.  *GKN Co. v.  Magness*, 744 N.E.2d 397, 402 (Ind. 2001).  However, our research has failed to disclose any Indiana decision extending that doctrine beyond a determination of whether the exclusivity provisions of Indiana workers' compensation laws apply to deny subject matter jurisdiction to a state trial court.  We are not inclined on our own to extend the application of the dual employer doctrine to other areas of  Indiana law.  Further, Logan does not allege in her complaint that IDOC was her employer; her reply brief contains the first mention of her adoption of the dual employer theory.  Even if we applied the *Magness* seven-factor test to determine if an employer-employee relationship exists, we think the relationship between IDOC and Logan would fall short of that standard.

[2]Logan refers to the incident report as being nine pages in length.  However, the incident report submitted with her supporting materials is only three pages long containing criticism of the DON with specific references to two incidents involving an undetected bowel obstruction suffered by an offender and an offender with a broken arm that went untreated for some time.

[3]The copy of the memo submitted by Logan with her supporting materials is almost indecipherable.  Despite its "fuzzy" format, we perceive it to be a report on an incident with respect to a collaborating outside professional and procedural issues regarding gate passes and consulting agreements for outside professionals, for which Logan complains of being  unduly criticized and berated by Lewis and Vaisvilas.

investigations department had requested.[4]  She does not claim in any of these documents that a

state law or rule is being violated, and while the latter document includes her complaints of

doctors orders not being followed and medications not being properly accounted for (potential

professional malpractice and ethical issues), it is difficult to categorize the writings as reports of

illegal activities.  In addition, the statute requires that the report of violations be "concerning the

execution" of the public contract.  Logan complains of the actions, or lack thereof, of

government employees, not of a problem in her private employer's execution of the public

contract.  Perhaps most importantly, Logan has been adamant in her argument that the retaliation

began immediately following her verbalization of her concerns and her request for Lewis's

removal at the meeting at IDOC headquarters on August 16, 2002.  Only one of the memos

predates that meeting and it clearly is not a report of violations of state laws or regulations.  If

the retaliation is based upon her verbal statements at an administrative meeting, and her

statements did not include a mention of laws or rules being broken, IND. CODE § 22-5-3-3

would not apply.  The requirement that any retaliation against Logan be based on her making a

written report complaining of violations of state law or rules in connection with the execution of

a public contract has simply not been satisfied.

　　　While there is evidence to support a finding of retaliation against Logan, it is, as she

herself seems to emphasize in all other arguments, related to her exposing critical health care

issues and trying to have Lewis removed as the DON at New Castle for neglecting her official

---

[4]This document is a nine page narrative of past and ongoing problems she perceived with
respect to the nursing care at New Castle and the lack of cooperation and communication she
faces.  It is particularly critical of the DON, as well as Gehrke and Vaisvilas.

responsibilities.  Such conduct is not actionable under IND. CODE § 22-5-3-3, assuming that statute provides a private right of action which is a question we are spared from deciding under theses facts.  We shall leave that question to Indiana appellate courts to decide in a future case.

**B.**     *Tortious Interference With an Employment Relationship*

Under Indiana law, a tortious interference claim may be brought with respect to an employment relationship even if that relationship is based on at-will employment.  *Bochnowski v. Peoples Federal Sav. & Loan Ass'n.*, 571 N.E.2d 282 (Ind. 1991).  However, since the essence of the claim is that someone outside the employment relationship in some manner scuttled what otherwise would have continued indefinitely, the claim may only be brought against a third party, not against the employer itself.  Therefore, PHS, along with Underwood, who was acting in his capacity as a PHS employee, are not subject to such a claim.  That leaves IDOC and the individual state employees as the only viable defendants in this cause of action.

The elements of the tortious interference claim are: (1) the existence of a valid employment relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from defendant's wrongful interference with the relationship.  *Bradley v. Hall*, 720 N.E.2d 747, 750 (Ind. App. 1999).  There is no dispute over Plaintiff's having demonstrated the first three of these five elements.  However, Defendants do challenge the final two, claiming that there was justification for their intervention and that PHS's termination of Logan's employment, not the transfer they suggested when they intervened, was the injury resulting in damages to Logan.

Defendants' argument that there was justification for intervention appears well- taken, but for the fact that it is founded on what they claim to be the intentions of the individuals involved.  There is certainly enough evidence of record to reach conclusions other than those posited by Defendants with respect to their true intentions.  Simply stated, on this matter we have a material factual dispute.  The effect of Lewis's and Logan's poor working relationship may have been the motivation for actions taken by the Defendants, including their request that she be removed as HCA, or there may have been a more vindictive and legally impermissible reason for stripping her of many responsibilities and barring others from communicating with her regarding important nursing program data, before requesting her removal from her position.

As for damages, that issue is one of proximate cause.  If Logan successfully convinces a jury that one or more defendants was not justified in interfering with her employment relationship, Logan will then need also to prove that "but for" the interference of that Defendant, she would not have lost her job.  *Hawkins v. Cannon,* 826 N.E.2d 658, 662-663 (Ind. App. 2005).  Certain of the named defendants are lower level managers who did not specifically participate in the meeting with Underwood, at which it was made clear that IDOC wanted Logan removed from the New Castle facility.  They argue that they can not be found liable because they made no recommendation or demand to PHS with respect to Logan's continued employment. That may be true, unless the conduct of Vaisvilas, Gehrke or any of the named defendants set in motion a chain of events that caused Logan's foreseeable damages and was uninterrupted by any superseding or intervening cause; then they could be found liable.  *See Paragon Family Restaurant v. Bartolini,* 799 N.E.2d 1048, 1054 (Ind. 2003).  Whether the resulting harm to Logan was foreseeable is, of course, another question of fact for the jury to decide.  *Control*

-12-

*Techniques, Inc. v. Johnson*, 762 N.E.2d 104, 107 (Ind. 2002).  Summary judgment is rarely appropriate for tort claims where a defendant's intent and conduct must be judged.  This case presents no exception to that general rule.  Too many questions of fact remain for us to grant summary judgment on Logan's claim of tortious interference as to any defendants, other than PHS and Underwood, whose dismissal as to this cause of action we will grant.

### C.    *Liability Under § 1983*[5]

The prerequisites to successfully prosecuting a claim of retaliation for the exercise of First Amendment rights are:  (1) plaintiff's engagement in speech which is constitutionally protected  under then existing circumstances, and (2) retaliation against plaintiff by the defendants because of the protected speech.  *Gustafson v. Jones,* 117 F.3d 1015, 1018 (7th Cir. 1997).  Obviously, the retaliation must have occurred under "color of law," to establish individual liability under 42 U.S.C. § 1983.  *Cunningham v. Southlake Center For Mental Health,Inc.*, 924 F.2d 106, 107 (7th Cir. 1991).

Defendants jointly argue that Logan's case fails to satisfy the critical  requirement that her speech was of the type protected under the First Amendment.  They maintain that Logan's speech did not concern a matter of public moment and that, even if it did, it would not survive

---

[5]We realize that the Supreme Court has recently heard oral argument in the case of *Garcetti, et al. V. Ceballos,* No. 04-473, an appeal from the Ninth Circuit which presents a question with regard  to whether First Amendment protection should be accorded job-related speech simply because it touches on matters of public concern.  While further instruction may be forthcoming with regard to this area of the law, we decide this claim on the basis of current precedent from the Supreme Court and our Seventh Circuit Court of Appeals.

the balancing of interests test applied in these types of cases.[6]  To determine if Logan's complaint regarding the facility's poor nursing practices amounts to constitutionally protected speech, we apply the familiar two-part *Connick-Pickering* test.  *Coady v. Steil*, 187 F.3d 727, 731 (7th Cir.1999)(citing, *Connick v. Myers*, 461 U.S. 138 (1983) and *Pickering v. Board of Ed. Of Tp. High School District 205, Will County, Illinois*., 391 U.S. 563 (1968)).  The first part of the test examines whether plaintiff's speech addresses a matter of public concern and, if so, then we reach the second part which requires that the citizen employee's interest in commenting be balanced against the government's interest in providing efficient public service.  *Id*.

Whether Logan's complaints addressed a matter of public concern is a question of law for the court to determine.  *Kokkinis v. Ivkovich*, 185 F.3d 840, 843 (7th Cir. 1999).  Generally, the Seventh Circuit directs that the airing of private grievances in the form of more general complaints about a public institution does not change the fact that the gripe is a personal one.  *E.g., Wright v. Illinois Dept. of Children & Family Services*, 40 F.3d 1492, 1494 (7th Cir. 1994).  We must examine the content, form and context of  Logan's suggestions and complaints to determine if they were primarily an employee grievance or a comment of general public concern.  *Cygan v. Wisconsin Dept. of Corrections*, 388 F.3d 1092, 1099 (7th Cir. 2004).

_____

[6]It is interesting to note that IDOC argues in favor of the application of the two-part *Connick-Pickering* (*Connick v. Myers,* 461 U.S. 138 (1983); *Pickering v. Board of Ed. Of Tp. High School District 205, Will County, Illinois*, 391 U.S. 563 (1968)) balancing test, which is traditionally applied to determine if the speech of a public employee is protected, while maintaining that it can not be held liable under § 1983 because Logan was a private employee.  Though we reject this latter contention for the reasons discussed in this entry, we do agree with IDOC that the nature of Logan's employment as the HCA at a public correctional facility which is charged by law with carrying out the responsibilities imposed on the state makes the application of the *Connick-Pickering* test appropriate.

The clear fact is that, through the time Logan met in Indianapolis with IDOC officials and others from PHS, her statements about poor nursing care at the hospital were not a personal grievance but a matter that Logan sought to correct for the benefit of the offenders, consistent with the general public interest in having offenders housed and treated humanely.  There is no evidence to indicate that her suggestion that the DON be replaced was not a personal reprisal or vendetta, but rather an assessment by an outsider to IDOC of how best to resolve a significant problem.  Her later protestations may have included some personal issues or gripes, but the speech that prompted the retaliatory action was most definitely related to a matter of general public concern.  This determination is consistent with the holdings of at least three circuit courts who also have found that the quality of care given those confined by the State is a matter of public concern.  *Catletti ex rel. estate of Catletti v. Rampe*, 334 F.3d 225, 230 (2nd Cir. 2003); Ramirez v. Oklahoma Dept. of Mental Health, 41 F.3d 584, 596 (10th  Cir.1994)*, overruled on other grounds by Ellis v. University of Kansas Medical Center,* 163 F.3d 1186, 1194-1197 (10th Cir.1998); *Frazier v. King*, 873 F.2d 820, 825 (5th Cir. 1989).

We move next to the task of balancing the interest of IDOC in assuring efficient operations at its facility against the interest of Logan in speaking out on the poor nursing care there.  We have no difficulty concluding that Logan's report of poor nursing involved a matter of significant concern to and on behalf of offenders.  She reported a person  with a broken arm going without treatment, doctors' medications orders being ignored or postponed and health screenings for  newly transferred offenders not being conducted so that the chance of a medically infected inmate passing his condition on to others was significantly increased.  Defendants argue that, to the extent Rice pushed for PHS to remove Logan, it  was out of appropriate concern for

the fact that a quality healthcare program at New Castle was impossible to achieve when the head of nursing could not get along with the lead administrator.  In Defendants' view, one or both needed to go and, as it turned out, both were in fact moved elsewhere.  While Lewis's and Logan's inability to work together may have been a legitimate concern on the part of Rice and Gehrke, their actions in stripping Logan of nearly all responsibility with respect to anything that required interaction with nursing left little need for her to relate on any regular basis with the DON.

In the final analysis, the factors most often considered in a *Pickering* balancing analysis work in Logan's favor; these factors include:  (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision making; and (7) whether the speaker should be regarded as a member of the general public.  *Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000).

The evidence does not indicate that Logan's complaints regarding poor nursing care disrupted the workplace or caused a lack of harmony, until Vaisvilas informed Lewis of Logan's suggestion that she be removed as DON, after which time apparently only the working relationship between Lewis and Logan was particularly unharmonious.  No overriding loyalty was implicit in Logan's position and her speech not only did not impede her ability to do her job,

it was designed to enhance it.  To a certain degree, the time, place and manner of the speech are representative of employee speech related to the processes of the workplace, as opposed to speech expressing public concerns.  However, the specific context of Logan's speech is that of a contract employee whose concerns regarding the quality of the healthcare at a State institution reached a level which finally impelled her to depart from her normal role and responsibilities by recommending to senior agency officials that they take a major personnel action because of the seriousness of the problem, and because nothing else she had done had brought about necessary improvement.   The context of such a departure from the norm weighs more heavily in favor of finding the speech as bearing on a matter of significant public concern.  In conducting this analysis, we conclude that the balance clearly favors Logan's interest in reporting what she had seen and experienced concerning the deteriorating quality of care for the prisoners.

The testimony of record gives rise to a reasonable inference that Vaisvilas, Gehrke and Rice were at least as concerned about defending themselves and their respective positions, in light of IDOC's concerns over the issues raised by Logan, as they were in assuring the efficient operation of services at the New Castle facility.  Vaisvilas, for example, told Logan that she had not seen "hell" until she tried to remove a DON, and then threatened that things would only get worse for Logan.  Neither Rice nor Gehrke had any criticism of Logan's performance as HCA until after the August 16th meeting when their own supervisors became concerned over the health care issues at New Castle brought to light by Logan; even then, Rice and Gehrke's criticisms lacked meaningful substance.  Dr. Reiger's admitted statement to Logan that everyone thought it was easier to remove an HCA than a DON can also certainly be viewed as a not to subtle attempt to chill any propensity by Logan's to register further complaints.  The temporal proximity

between Logan's speech and the criticisms of her previously unquestioned performance is also relevant in deciding whether Logan's remarks played a substantial role in the decision to remove her from her position, or whether she would have been removed regardless of her speech.

In conclusion, we find that the plaintiff has carried her burden, at least through this stage of the litigation, to establish as a matter of law that her speech was directed to a matter of public concern and that, in balance, her interest in raising the issue outweighed or at least equaled the State's interest in efficiently providing services.  Stated otherwise, we hold that her speech was constitutionally protected.  Whether Logan was retaliated against because of her speech, however, is a question of fact.  We have previously pointed out evidence that could lead to the conclusion that she was indeed the target of retaliatory conduct.  Defendants' contention that she would have been relieved of her position regardless of her speech is another factual matter reserved for later resolution, undermined by the fact that the criticism of her performance was based on relatively minor concerns and came only after Logan had pointed out critical healthcare problems to IDOC.

IDOC and its employees contend further that they can not be held liable because IDOC was  not Logan's employer.  PHS and Underwood raise the "color of law" requirement,  arguing that Underwood clearly acted in his capacity as a Vice-President of a private company, PHS, in terminating Logan following her refusal to accept a transfer.  "When a private actor is implicated, the section 1983 plaintiff may nevertheless prevail if (she) shows sufficient state involvement in the decision to trigger constitutional protection." *Cunningham,* 924 F.2d at 107. Thus, if Underwood/PHS as a private actor willfully participated in joint action with the State of

its agents while sharing  an unconstitutional goal, that is enough  to establish that the private

actor was part of a conspiracy in satisfaction of the "color of law" requirement.  *Stagman v.*

*Ryan*, 176 F.3d 986, 1003 (7th Cir. 1999).

Logan cites the Seventh Circuit's reversal of a summary judgment in *Malak v. Associated*

*Physicians, Inc.*, 784 F.2d 277 (7th Cir. 1986) as a case directly on point with the circumstances

in this case.  In *Malak,* an emergency room physician at a public hospital publicly criticized

emergency room conditions at the hospital.  *Id*. at 278.  Like Logan, he was employed by a

private entity that had contracted with the county hospital to operate its emergency room

services, including the provision of staff physicians.  *Id*.  When his private employer terminated

his employment and the hospital revoked his staff privileges, Dr. Malak brought an action

against the private employer, the hospital Board of Trustees, two of its employees and two

officers of the private employer, claiming that the group of private and public defendants

conspired to terminate his employment because of his public criticism of the emergency room

conditions.  *Id*.  The district court ruled that the plaintiff failed to prove that any acts undertaken

by the defendants constituted state action.  *Id*. at 279.  On appeal, the Seventh Circuit reversed

and remanded the case for further proceedings.  *Id*. at 284.

The Court of Appeals found that those involved on behalf of the hospital were high

enough up the management chain to be policymakers, which allowed the hospital to be a viable

defendant, if plaintiff could prove a conspiracy between the hospital and the private employer.

*Id.* at 283.  It also found that a doctor's affidavit stating that he heard one of the private company

officers say that the termination was a joint decision between his company and the hospital,

along with a nurse's testimony supporting a similar conclusion based on the actions of the individual hospital employee defendants, were enough for plaintiff to survive summary judgment. *Id. at 281-282.*   We share Logan's view that the *Malak* case is applicable precedent to the case at bar.

The testimony regarding a December 2002 meeting (or meetings) between IDOC officials and Underwood which resulted in Logan's being relieved of her post at New Castle is not entirely consistent, but there is more than enough evidence to support an inference that IDOC and PHS, though perhaps possessing separate motivations, shared a common goal of silencing Logan's criticism of the nursing care program by removing her from the HCA position at New Castle.  Underwood testified that Defendants Rice and Ladd stated to him that they wanted Logan out of the facility immediately.  Ladd confirmed that a discussion of Logan's termination did occur, but he could not remember who said what concerning the actions to be taken.  And Rice testified that he believed it was Underwood and IDOC's Chuck Miller who came up with the idea of having Logan switch facilities, by moving from the position of HCA at New Castle to HCA at Pendleton.  While Underwood may have sought simply to protect the PHS contract with IDOC while IDOC officials possessed  a more nefarious interest, there is nonetheless ample evidence that PHS and Underwood cooperated with IDOC in targeting Logan in retaliation for her efforts to correct nursing healthcare delivery problems at New Castle by recommending that a replacement be found for the DON.  A person can be deemed a co-conspirator simply on the basis of his knowledge of the illegal intent and actions in cooperation with or acquiescence in achieving the goal. *See U.S. v. Paramount Pictures*, 334 U.S. 131, 161 (1948); *U.S. v. Albarran,* 233 F.3d 972, 976 (7th Cir. 2000).  The fact that IDOC was not Logan's employer and PHS was

not an agency of the State is not controlling in the face of evidence that together their actions were directed towards accomplishing the goal set by managers within the State agency.  This combined activity satisfies the "color of law" requirement of § 1983, as a matter of law, but questions of material fact prevent the possibility of summary judgment.

Individual Defendants Vaisvilas, Gehrke and Dr. Reiger contend that because they did not directly participate in the decision to remove Logan from the New Castle facility and had no role in the termination of her employment with PHS, they are freed from liability under § 1983.  However, the evidence suggests that all three Defendants were conspicuous participants in the threats and criticisms of Logan, which suggests the possibility of there having been a "cat's paw" in this situation.  The "cat's paw" doctrine (where the named decision makers were substantially directed or influenced by others who acted with retaliatory or discriminatory motives, thus undermining the independence of the official actors) in establishing § 1983 liability has not occurred as frequently as in Title VII discrimination cases.  Nonetheless, there have been decisions discussing and approving its application under § 1983, *see, e.g.  Crabb v. Itawamba County, Mississippi,* Slip Copy, 2005 WL 2648017 (N.D.Miss. Oct. 17, 2005); *Kmetz v. State Historical Society*, 304 F.Supp.2d 1108, 1131 (W.D.Wis. 2004).  We are spared the necessity of exploring the interstices of this somewhat obscure doctrine, however, because Logan herself failed to respond to Defendants' argument that they lacked any personal involvement in the decision to remove her from her post and therefore should not be held liable.  In the absence of evidence of record supporting a "cat's paw" theory, summary judgment shall be entered in favor of Defendants Vaisvilas, Gehrke and Dr. Reiger.

All that remains at this point are the Eleventh Amendment defenses of sovereign immunity and the State Defendants' claim of a lack of status as a "person" under § 1983.[7]   *Will v. Michigan Dept. of State Police*, 491 U.S. 58 (1989) established that § 1983 suits brought against a state agency or an agency employee acting in his official capacity may not be brought unless only prospective relief is sought.  According to *Will*, only when an agency official is acting in his individual capacity, and under color of law, may he or she be subject to liability under § 1983.  The Supreme Court has determined that Congress had no intention of overriding Eleventh Amendment sovereign immunity principles by including States as persons who could be sued under § 1983.  *Id.* at 2309-2310.  Consequently, summary judgment in favor of IDOC and the individual IDOC employees acting in their official capacities is proper with respect to Plaintiff's § 1983 claim, because Plaintiff pursues damages and not prospective relief.

## IV.    Conclusion

For the reasons discussed above, the Motion for Summary Judgment filed by Defendants Underwood and PHS (**Docket # 34**) is GRANTED IN PART and DENIED IN PART.  The State Defendants' Motion For Summary Judgment (**Docket # 37**) is also GRANTED IN PART and DENIED IN PART.  Summary judgment shall enter in favor of all Defendants with respect to Plaintiff's claim under IND. CODE § 22-5-3-3.  Plaintiff's claim of tortious interference with her employment relationship shall proceed as against Defendants IDOC, Reiger, Vaisvilas, Ladd,

---

[7]Defendants have raised a sovereign immunity defense to which Logan has responded by arguing that "qualified immunity" should not attach.  We cannot discern whether this briefing error occurred intentionally or by inadvertence.  Obviously, the two theories are very different. Since Defendants have not asserted a qualified immunity defense, we have not addressed the issue in this order.

Rice and Gehrke.  Summary judgment shall enter in favor of Defendants PHS and Underwood

on the tortious interference claim.  Finally, Plaintiff's § 1983 claim shall proceed against

Defendants Ladd, Rice, PHS and Underwood, in their individual capacities, but summary

judgment shall enter in favor of all Defendants acting in their official capacities and Defendants

IDOC, Reiger, Vaisvilas and Gehrke in their individual capacities as well.


     IT IS SO ORDERED


     11/08/2005


SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana


Copies to:

Richard M. Bramer
INDIANA STATE ATTORNEY GENERAL
rbramer@atg.state.in.us

David Robert Brimm
WAPLES & HANGER
dbrimm@wapleshanger.com

Roger K. Kanne
ZEIGLER COHEN & KOCH
rkanne@zcklaw.com

Kathryn Lynn Morgan
INDIANA STATE ATTORNEY GENERAL
kmorgan@atg.state.in.us

Juliana Beth Pierce
INDIANA STATE ATTORNEY GENERAL
jpierce@atg.state.in.us

Richard A. Waples
WAPLES & HANGER
richwaples@aol.com